## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEAH A. WILSON,           :        CIVIL ACTION
      Plaintiff        :
                          :
      v.              :        NO. 06-5344
                          :
YOUNG WINDOWS INC., et al.,      :
      Defendants       :

## M E M O R A N D U M

STENGEL, J.                                    March 3 , 2009

     Leah A. Wilson filed an amended complaint against her former employer Young Windows, Inc., and its Production Manager William Jeffers, alleging: (1) employment discrimination based on gender, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; (2) a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.; and (3) a violation of the Pennsylvania Human Relations Act, 42 P.S. § 955(a), *et seq*. Defendant Young Windows has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to which Mrs. Wilson has responded. For the following reasons, I will grant the motion in part, and deny the motion in part.

## I. BACKGROUND

     The amended complaint alleges that Mrs. Wilson was hired by Young Windows in

May 2000 as a "lacer."[1]  Am. Compl. ¶ 14.  Mr. Jeffers was hired the following year by

Young Windows as its Production Manager.  Id. ¶ 16.  Mrs. Wilson alleges that when Mr.

Jeffers was hired, her work environment became hostile, demeaning, abusive, and overtly

discriminatory.  Id.

      Mr. Jeffers towered over Mrs. Wilson in stature.  Id. ¶ 35.  When Mr. Jeffers

would summon Mrs. Wilson to his office, Mrs. Wilson was frightened to be alone with

him because he intimidated her, and made her feel that she was in danger of losing her

job.  Id. ¶¶ 34-35.  Many times, Mrs. Wilson was allegedly brought to tears in Mr. Jeffers'

office due to his behavior.  Id. ¶ 37.  Mr. Jeffers knew that Mrs. Wilson was getting

married on July 5, 2003.  Nevertheless, he asked her if she wanted to work over-time on

that day.  Id. ¶ 36.

      Mrs. Wilson also contends that Mr. Jeffers caused her to feel that her job was in

jeopardy by forcing her to perform janitorial duties which made her feel demeaned and

belittled in front of her co-workers.  Id. ¶ 20.  Mrs. Wilson unsuccessfully filed a

grievance about this discriminatory treatment, but the harassment and retaliation

escalated.  Id. ¶ 21.  She further contends that Mr. Jeffers required Jerry Scanlon, the

shop's foreman, to review only Mrs. Wilson's work, and none of her co-workers' work.

Id. ¶¶ 22, 45, 48.  Mr. Scanlon remitted a positive review of Mrs. Wilson's work to Mr.

---

[1]  Though not mentioned in the amended complaint, there is other evidence which shows that Mrs. Wilson was originally hired by Young Windows as a lacer on May 11, 1998, and was laid off on March 22, 1999.  Her seniority was terminated, and was not retroactively applied when she was rehired on May 1, 2000.  See Pl. Ex. 25.

Jeffers. Id. ¶ 23.

Mr. Jeffers allegedly printed sexist and racist jokes and disseminated them among co-workers. Id. ¶ 44. Once, when Mrs. Wilson was in his office, Mr. Jeffers remarked to co-workers, "I've got a babe in my office and it doesn't get much better than that." Id. ¶ 46. He moved Mrs. Wilson's bench to be situated near his window and constantly watched her. Id. ¶ 47. Mr. Jeffers also allegedly made inappropriate remarks to Mrs. Wilson such as "your shirt fits better than mine." Id. He also harassed Mrs. Wilson for smoking. Id. ¶ 48. Mr. Jeffers allegedly told a union representative once that "Mrs. Wilson got his Irish temper up." Id. ¶ 49.

When Mrs. Wilson injured her back at work, Mr. Jeffers provided a back-belt for her to wear, but then assigned her even heavier windows to assemble. Id. ¶ 50. He also contacted Mrs. Wilson's physician to change her appointments without her consent or knowledge. Id. ¶ 54.

Mrs. Wilson also contends that while Mr. Jeffers was placing signs in all areas of the workplace stating that there would be a 28 inch egress, he allegedly looked at Mrs. Wilson's posterior and said "she would not have any problems with her egress." Id. ¶ 19.

In the fall of 2002, following the ratification of a new collective bargaining agreement between Young Windows and the union, the hierarchy of job classifications at Young Windows was restructured, and many positions held by employees with seniority were terminated. Id. ¶ 24. The company's plan was to train the remaining employees

with seniority which would enable them to be promoted to other positions. Id. ¶ 25. Mrs. Wilson was initially excited about the new policy, because as an employee with as much technical skill as most of the remaining employees, she believed that she would be trained and promoted to the newly-created "A" rate assembler, due to her seniority status. Id. ¶ 26. Instead, three male assemblers became "A" rate assemblers automatically.[2] Id. ¶ 27. Although Mrs. Wilson was allegedly denied training and promotion to attain the "A" rate, she worked side by side with the "A" rate assemblers, and was even allegedly forced to train some of these co-workers. Id. ¶ 28.

In her first Charge of Discrimination filed with the EEOC, Mrs. Wilson insisted that she was being subjected to inequitable pay for performing the same job/duties as all of the male employees with whom she worked and trained. Id. ¶ 29 As a result, Mrs. Wilson issued multiple complaints to Mr. Jeffers, stating that treatment towards women was unfair, and that women were being prevented from being promoted to the "A" rate for assemblers. Id. ¶ 30. Mrs. Wilson also alleges that even though her productivity was consistently above 105%, the benchmark required to become an "A" rate assembler, she was refused promotion, and her windows were the only windows that were counted for production purposes. Id. ¶¶ 31-32. Instead, Mr. Jeffers continuously insisted that Mrs.

---

[2] Two of the three males had been hired as assemblers, and the third male had been trained previously as an assembler. All three could meet the newly-formed "A" rate production levels. See Jeffers Dep. at 36-38, 75-77. In contrast, Mrs. Wilson worked as a subassembler prior to the new collective bargaining agreement. After ratification, she remained a subassembler until May 26, 2003, when she was awarded a "B" rate assembler position after training. See Def. Ex. 2.

Wilson "just give [him] one more month of this kind of production." Id. ¶ 33.

Mrs. Wilson also alleges that the company's absence and lateness policies were more harshly applied to her. For example, Mr. Jeffers gave Mrs. Wilson one "point" towards suspension for being late because her house caught on fire, and another point when she had to rush her husband to the hospital after being bitten by a spider. Id. ¶ 52. Conversely, when a male co-worker failed to report to work and had no valid excuse, Mr. Jeffers allegedly told him to say that he was at a funeral so he would not be penalized. Id. ¶ 53.

In March 2004, Mrs. Wilson was promoted to "A" rate assembler. Id. ¶ 39. The amended complaint alleges that Mr. Jeffers told Mrs. Wilson's co-workers that "he had thrown her a bone." Id. ¶ 40. Mrs. Wilson testified that she did not hear Mr. Jeffers make this remark, but that a co-worker informed her about it. See Wilson April 27, 2007 Dep. at 122-125. After her promotion, the harassment to which Mrs. Wilson had been subjected exacerbated to the point of "invidious discrimination" by Mr. Jeffers. See Am. Compl. ¶¶ 41, 43. Complaints to Young Windows resulted in alleged retaliation against Mrs. Wilson which left her "emotionally battered." Id. ¶ 42. In 2005, for example, Mrs. Wilson allegedly complained to Joe Lepo, the company's vice president, about working with Mr. Jeffers. Id. ¶ 56. Mr. Lepo allegedly told her to "get used to it, because he's not going anywhere." Id. The amended complaint characterizes Mrs. Wilson's contact with Mr. Lepo as requesting accommodations. Id.

In addition to not being automatically promoted to the "A" rate assembly position, there were other times during her employment with Young Windows when Mrs. Wilson felt she was being discriminated against because of her gender, yet she chose not to file a grievance or to complain to management. See Wilson April 27, 2007 Dep. at 171, 189. For example, the shop union representative suggested to Mrs. Wilson to go to the EEOC to file a Charge because Mrs. Wilson felt she was not receiving the training she wanted or needed to reach the "A" rate. Id. at 189. She chose not to do so because she "was petrified to go to the EEOC. [She] just wanted to keep [her] job. . .[She] kept it to [her]self." Id. at 190. Another time, Mrs. Wilson was passed over for a machinist position for which she had applied. The company hired a male from outside the company with no experience. Id. at 193, 197. She felt that she was not considered for the job because she was a woman. Again, Mrs. Wilson chose not to file a grievance because she "just wanted to keep [her] job." Id. at 195, 198, 199.

Eventually, Mrs. Wilson complained about Mr. Jeffers to her union representative because she was anxious and fearful of him and felt that Mr. Jeffers was trying to constructively discharge her. Id. ¶ 57. No action was taken to separate Mr. Jeffers from Mrs. Wilson. Id. ¶ 58. Mrs. Wilson's severe anxiety and depression continued to increase, and by April 2005, she had gained fifty pounds and had become emotionally debilitated. Id. ¶¶ 59-60.

In July 2005, Mrs. Wilson felt that she could no longer mentally endure the alleged

hostile and discriminatory work environment.  She contacted Stephanie Cook, the president of Young Windows, to request "reasonable accommodations."  Id. ¶ 61.  Mrs. Wilson contends that Miss Cook subsequently began to treat Mrs. Wilson's complaints and requests with disdain.  Id. ¶ 62.  Miss Cook provided Mrs. Wilson with Family Medical Leave Act ("FMLA") papers, but allegedly did not inform her that such a leave would cease in twelve weeks.  Id.  Because Mrs. Wilson believed that the leave would last six months, as would a disability, she signed the papers requesting the FMLA leave.  Id. ¶¶ 63, 64; see also Pl. Ex. 22.  On September 26, 2005, Mrs. Wilson received a letter informing her to return to work by October 5, 2005, or her position with the company would be filled.  See Am. Compl. ¶ 65; see also Pl. Ex. 31.  Mrs. Wilson's physician informed her that she was not yet able to return to work.  See Am. Compl. ¶ 66.  On October 8, 2005, Mrs. Wilson received correspondence from Miss Cook, informing her that her employment was terminated because she was unable to return to work on October 5, 2005, following her twelve weeks of FMLA leave.  Id. ¶ 67; see also Def. Ex. 61.

## II.  LEGAL STANDARD

Subject matter jurisdiction over the alleged violations is proper pursuant to 28 U.S.C. § 1331.  Because Mrs. Wilson's state law claim forms part of the same case or controversy, subject matter jurisdiction over the PHRA claim is proper pursuant to 28 U.S.C. § 1367(a).

Summary Judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. The moving party must establish that there is no triable issue of fact as to all of the elements of any issue on which the moving party bears the burden of proof at trial. See In re Bressman, 327 F.3d 229, 237-38 (3d Cir. 2003).

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to

8

that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322.

A motion for summary judgment looks beyond the pleadings and factual specificity is required of the party opposing the motion. <u>Celotex</u>, 477 U.S. at 322-23. In other words, the non-moving party may not merely restate allegations made in its pleadings or rely upon "self-serving conclusions, unsupported by specific facts in the record." <u>Id.</u> Rather, the non-moving party must support each essential element of its claim with specific evidence from the record. <u>See id.</u>

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255; <u>see also</u> <u>Hugh v. Butler County Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005) (a district court analyzing a motion for summary judgment must view the facts in the light most favorable to the non-moving party and make every reasonable inference in favor of that party). The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363

(3d Cir. 1992).

## III. DISCUSSION

Mrs. Wilson filed an amended complaint in which only three counts of employment discrimination remain.[3] The first count is based on gender and includes allegations of sexual harassment, hostile work environment, and retaliation; the second is based on disability; and the third alleges a violation of the PHRA. The defendant argues that these remaining counts must be dismissed, and judgment entered in its favor.

Generally, a plaintiff alleging employment discrimination cannot bring claims in federal court that were not first included in a Charge of Discrimination filed with the Equal Employment Opportunity Commission and exhausted at the administrative level. See Burgh v. Borough Counsel of Montrose, 251 F.3d 465, 469 (3d Cir. 2000). The administrative Charge must be filed with the EEOC within the statutory time period, which in Pennsylvania is three hundred (300) days. Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000); see also Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006); see also 42 U.S.C. § 2000e-5(e)(1); and 42 U.S.C. § 12117(a). A Charge may be amended to cure technical defects or omissions, or to clarify and amplify allegations made therein; such amendments and amendments alleging additional acts

---

[3] On August 17, 2007, the plaintiff voluntarily dismissed Count IV of her amended complaint alleging a violation of the Employee Retirement Income Security Act of 1974. On June 4, 2007, the plaintiff also voluntarily dismissed Count V of the amended complaint which alleged intentional infliction of emotional distress. Because Defendant Jeffers was only named in Count V of the amended complaint, he is dismissed from this case.

which constitute unlawful employment practices related to or growing out of the subject matter of the original Charge will relate back to the date the Charge was first received. See 29 C.F.R. § 1601.12(b). The Court of Appeals for the Third Circuit has recognized that this exhaustion requirement serves two purposes:

> First, it puts the employer on notice that a complaint has been lodged against him and gives him the opportunity to take remedial action. Second, it gives the EEOC notice of the alleged violation and an opportunity to fulfill its statutory responsibility of seeking to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.

Bihler v. Singer Co., 710 F.2d 96, 99 (3d Cir. 1983).

According to well-settled law, the scope of a judicial complaint is not limited to the four corners of an EEOC Charge. The relevant test in determining whether a plaintiff was required to exhaust her administrative remedies is whether the acts alleged in the subsequent complaint filed here are fairly within the scope of the EEOC Charge or the investigation arising therefrom. Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996); Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984) (same); see also Hicks v. ABT Assoc., Inc., 572 F.2d 960 (3d Cir. 1972) (the addition of a sex discrimination claim permitted even though the EEOC only investigated race discrimination allegation because the sex discrimination claim would have grown out of a proper EEOC investigation of race claim). The legal analysis turns on whether there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may

fairly be considered explanations of the original charge or growing out of it.  See Galvis v. HGO Servs., 49 F. Supp. 2d 445, 449 (E.D. Pa. 1999) (citing Bailey v. Storlazzi, 729 A.2d 1206 (Pa.Super. 1999)).

Here, the defendant argues that the remaining counts in Mrs. Wilson's amended complaint must be dismissed because they do not fall fairly within the scope of Mrs. Wilson's EEOC Charges and investigations.  I do not agree.

## A. Mrs. Wilson's Original Charge of Discrimination

Mrs. Wilson's last day physically present at Young Windows was July 5, 2005, when she requested FMLA leave due to panic attacks, anxiety, and depression.  See Pl. Ex. 22; Def. Ex. 51.  She never returned to the job and thus was terminated on October 5, 2005.  Shortly thereafter, Mrs. Wilson contacted the EEOC and submitted responses to its various questionnaires without the assistance of counsel or employees of the Commission.

On the EEOC's Charge Information Questionnaire, Mrs. Wilson checked "disability," "sex," and "retaliation" as the bases for her complaint.  See Pl. Ex. 20; Def. Ex. 74.  She explained that she suffers from anxiety/depression and panic disorder "created by my production manager.  I am currently disabled."  Id.  She also noted that she received differential treatment because of her sex.  In explaining her retaliation claim, Mrs. Wilson said, "possible retaliation that I complained that my production manager was cause of my disability or that I made waves about differential treatment."  Id.  As examples of why she believed that her disability was created by her production manager,

Mrs. Wilson said that (1) he made becoming an "A" rate nearly impossible for women, (2) he made her do janitorial duties which she found degrading, (3) he changed her workers' compensation physicians' appointments without her knowledge or approval, and (4) he never hired women. Id.

On the EEOC's ADA Intake Questionnaire, Mrs. Wilson indicated that she could not return to work at Young Windows, that she begins to feel better until she has to discuss her previous work environment, and that after she attempted to talk with her employer's vice president about how she felt targeted by Mr. Jeffers, the company "did everything to get rid of" her. See Pl. Ex. 19.

On the EEOC's Discipline Questionnaire, Mrs. Wilson indicated that she was discharged even though she was out on disability created by a hostile work environment. See Pl. Ex. 21. She further indicated that she believes she was discharged due to her disability, i.e., anxiety/depression/panic disorder, which was created by her production manager. Id.

Upon receipt of these questionnaires, the EEOC assigned Mrs. Wilson's case to Investigator Kurt Jung. After a telephone conversation with Mrs. Wilson, Mr. Jung prepared a proposed Charge of Discrimination, sent it to Mrs. Wilson, and asked her to review the document and inform him of any inaccuracies or necessary changes on the Charge. See Def. Ex.79-80. On March 10, 2006, Mrs. Wilson signed the document having made no corrections, edits, or additions. It was filed at the EEOC on March 13,

2006.  The Charge specified that the cause of discrimination was based on sex, disability and "other," i.e., the Equal Pay Act,[4] and that the latest date discrimination took place was on March 1, 2004, when she finally attained the "A" rate assembler position.  Id.  In the "Particulars" section of the Charge, Mrs. Wilson indicated that from 2002 to March 2004, her employer paid three male employees more money than she was paid for performing the same job.  Id. (emphasis added).  She further alleged,

> I believe that Respondent discriminated against me because of my sex (female) and/or my disability in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), the Equal Pay Act of 1963, as amended (EPA) and/or the Americans with Disabilities Act of 1990, as amended (ADA) when it paid non-disabled male assemblers more than me for performing the same job.

See Def. Ex. 80 (emphasis added).  Although various statutes were mentioned, it is clear that the basis of the first Charge was one of unequal pay in violation of 29 U.S.C. § 206(d)(1).[5]  A letter written by Mrs. Wilson to Mr. Jung on December 8, 2005 further supports this finding:

---

[4] There is no count in the amended complaint alleging a violation of the Equal Pay Act.

[5] Title 29 of the United States Code, Section 206(d)(1)(d) provides:  No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex:  Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

> I hope you find the following information sufficient in determining my case against Young Windows, Inc., <u>for equal pay for equal work</u>. I was paid less than Chester Kczynski, Robert Johnson and Kevin Johnson from 2002 until March of 2004. We worked side by side developing "Line One" and also on the assembly of the "Backhoe" window.

<u>See</u> Def. Ex. 78 (emphasis added). Mrs. Wilson was given the opportunity to review the Charge and make any modifications or additions she felt necessary before the Charge was filed with the EEOC. She chose to make no such changes, and the Charge was filed as prepared. The sworn affidavit of Mr. Jung further supports the finding that Mrs. Wilson's original Charge was one of unequal pay:

> On or about November 28, 2005, I was assigned Ms. Wilson's initial Charge of Discrimination, Charge No. 170-2006-00424 ("initial Charge"), in order to complete the intake of her complaint, which included drafting the formal Charge of Discrimination. On or about May 1, 2006, I was assigned the initial Charge's file for investigation by my supervisor, George E. King, Jr. ("Mr. King").
>
> In preparation for drafting Ms. Wilson's formal Charge of Discrimination, she and I had a lengthy phone conversation on or about December 22, 2005 to discuss her allegations, including the factual basis and substantive nature of her complaints.
>
> During our telephone conversation, Ms. Wilson's complaint against Defendant was an Equal Pay Claim based upon gender and disability. At no time did Ms. Wilson discuss any sexual harassment allegations, a hostile work environment based upon sexual harassment or any retaliation claims. She advised that her last date of harm occurred on or about March 1, 2004. After discussing her allegations, Ms. Wilson agreed that the Charge of Discrimination would be based solely upon disparate treatment concerning her pay. It is Commission

15

> policy that if a Charging Party insists that a claim(s) be
> included in his or her Charge, we will not deny the request.
> At no time did Ms. Wilson suggest or insist that additional
> claims be included within her initial Charge.
>
> After my telephone discussion with Ms. Wilson, I drafted a
> formal Charge of Discrimination which Ms. Wilson signed
> and dated March 10, 2006.  Ms. Wilson did not make any
> revisions and/or additions to the Charge prior to signing it
> despite being advised that she could do so.

See Pl. Ex. 19; see also Def. Ex. 77.

That Mrs. Wilson checked the boxes for "sex" and "disability" on the original Charge does not affect my determination.  The narrative in the "Particulars" section is devoid of any allegations of employment discrimination other than that of unequal pay. See Johnson v. Chase Home Fin., 309 F. Supp. 2d 667, 672 (E.D. Pa. 2004) (checking certain boxes are insufficient to establish those charges without supportive allegations in the narrative section of the Charge).  Making allegations on the EEOC questionnaires is also insufficient to exhaust administrative remedies.  Rather, the allegations must appear in the formal Charge signed by the claimant and served on the respondent.  Id.  Courts in this Circuit have found that intake questionnaires do not serve the same function as the formal Charge, are not part of the formal Charge, and therefore do not satisfy the exhaustion requirement in circumstances such as this where claims addressed in the questionnaires are omitted from the Charge and where the EEOC does not investigate the omitted claims.  See Phillips v. Daimler Chrysler Corp., 2003 U.S. Dist. LEXIS 23941 at *6 (E.D. Pa. 2003); see also Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 788 (W.D.

16

Pa. 2000).

Here, there does not exist the requisite close nexus between the facts supporting the claim of unequal pay and the additional charges made in Mrs. Wilson's amended complaint so that the latter could be considered explanations of the original Charge or growing out of the original Charge.  Accordingly, I must find that the claims of hostile work environment, sexual harassment, and retaliation do not fall fairly within the scope of the original EEOC Charge and investigation.  It is in the relationship between the amended complaint and Mrs. Wilson's second Charge of Discrimination, however, where some of her claims find relief.

### B. Mrs. Wilson's Second Charge of Discrimination

On May 1, 2006, newly-retained counsel wrote a letter informing the EEOC of her representation of Mrs. Wilson, and also requesting to amend the Charge to include retaliation and incidents of sexual harassment which were absent from the original Charge.  See Def. Ex. 81.  Counsel also asked to correct the latest date of discrimination from March 1, 2004 to "October 2005."  Id.

Mr. Jung responded to these requests by writing that because the allegations to which counsel referred did not concern Mrs. Wilson's original complaint of unequal pay, the Commission was unwilling to allow the original complaint to be amended.  See Def. Ex. 82.  Mr. Jung indicated that during his conversations with Mrs. Wilson in preparation of the Charge, "she never once mentioned or submitted anything in writing concerning

17

incidents of sexual harassment or with specificity incidents of retaliation." Id. He said that Mrs. Wilson "decided to file only about the disparate treatment concerning her pay." Id. Finally, Mr. Jung informed counsel that Mrs. Wilson would need to file a second Charge of Discrimination which included the new allegations of sexual harassment and/or retaliation. Id.

Accordingly, on June 6, 2006, Mrs. Wilson filed her second Charge of Discrimination including those allegations with a latest date of discrimination being "October 2005." See Def. Ex. 83. According to Mr. Jung, the issues raised within this second Charge were untimely and beyond the three hundred (300) day statute of limitations. Thus, the EEOC dismissed the second Charge on September 12, 2006. See Def. Ex. 77 at 3.

I do not agree with the EEOC's determination that the entire second Charge was untimely. A cause of action accrues the moment the plaintiff either is aware, or should be aware, of the existence of and source of an injury, not upon awareness that this injury constitutes a legal wrong. Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 287 (3d Cir. 2003). Each discrete act of discrimination is treated separately for determining whether it was timely filed, but the sole exception to this rule is a claim of hostile work environment. A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice, and those acts occur over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of

18

harassment may not be actionable on its own. Amtrak v. Morgan, 536 U.S. 101, 115 (2002). Here, it is true that many of the allegations set forth in the second Charge involved behavior which occurred outside the three-hundred (300) day statute of limitations.[6] In Morgan, the Supreme Court of the United States stated that absent grounds for equitable tolling,[7] an individual cannot recover for a discrete act of discrimination that predates the mandatory filing period. 536 U.S. at 117. So long as one act that is part of the alleged hostile work environment claim is timely, the entirety of the hostile work environment claim is timely. Id. Mrs. Wilson's last physical day on the job was July 5, 2005. To be timely, any allegation of employment discrimination based on hostile work environment or sexual harassment would have had to be included in a

---

[6] For example, the second Charge alleges that Mrs. Wilson's work environment became hostile beginning in 2001; that she was not immediately promoted to an "A" rate assembler in the fall of 2002 even though three males were; that her superiors purposely asked her to work on July 5, 2003, her wedding date; that when she was finally promoted in March 2004, Mr. Jeffers had allegedly commented that he "had thrown her a bone;" that when she had a work-related acute crush injury, Mr. Jeffers called her doctor to change her appointments without her knowledge; and that finally, as a result of "the aforementioned abuse, humiliation, and discriminatory treatment," she began to have panic attacks and she gained fifty (50) pounds by April 2005. All of this treatment to which she refers is outside the three-hundred (300) day statute of limitations.

[7] Under the doctrine of equitable tolling, the court may toll the mandatory filing period if strict enforcement would be inequitable to a plaintiff. Oshiver v. Levin, 38 F.3d 1380, 1387-1388 (3d Cir. 1994). The Third Circuit Court of Appeals has stated "that there are three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Id. at 1387 (citing School District of City of Allentown v. Marshall, 657 F.2d 16, 19-20 (3d Cir. 1981)). Here, there are no such circumstances to support the equitable tolling of the filing period.

Charge of Discrimination filed with the EEOC by May 1, 2006.  Mrs. Wilson's second Charge was filed on June 6, 2006.  Accordingly, any discrete act of sexual harassment or behavior supporting a claim of hostile work environment alleged in that Charge is untimely, and will not be addressed here.

However, Mrs. Wilson was terminated on October 5, 2005, allegedly because she was unable to return to her position at Young Windows.  Significantly, the Supreme Court of the United States listed termination as a discrete act which is easy to identify.  Morgan, 535 U.S. at 114.  By that date, Mrs. Wilson knew of her injury, i.e., the termination, and her cause of action began to accrue.  See Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 287 (3d Cir. 2003) (a cause of action accrues the moment the plaintiff either is aware, or should be aware, of the existence of and source of an injury, not upon awareness that this injury constitutes a legal wrong).  Mrs. Wilson had three hundred (300) days to file a Charge of Discrimination with the EEOC, or until August 1, 2006.  Any claims based on an alleged discriminatory termination and included in her second Charge filed with the EEOC on June 6, 2006, are timely.  Accordingly, I will address only the claims of retaliation under Title VII and the PHRA and of discriminatory termination based on the ADA.

## C. Mrs. Wilson's Amended Complaint

### 1. Retaliation Based on Title VII[8] and the PHRA[9]

In Counts I and III of her amended complaint, Mrs. Wilson claims that she was terminated from her employment with Young Windows because of her gender, and in retaliation as a result of her informal and formal protests concerning discrimination. See Am. Compl. ¶¶ 71, 73, 85-86. As discussed above, any evidence of potential discrimination based on gender, including unequal pay, sexual harassment, and hostile work environment occurred outside the statute of limitations. Thus, only Mrs. Wilson's claim of retaliation can be reviewed here.

Title VII and the PHRA prohibit employers from retaliating against employees who oppose discriminatory employment practices or file their own Charges of Discrimination. 42 U.S.C. § 2000e-3(a); 43 P.S.C. § 955(a). Because Mrs. Wilson has not produced any direct evidence of discrimination, she must proceed under the burden-shifting framework first established by the Supreme Court of the United States in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973). See Jones v. Sch.

---

[8] Under 42 U.S.C. § 2000e-2(a)(1): it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

[9] The PHRA provides "the opportunity for an individual to obtain employment for which she is qualified without discrimination because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, national origin." Courts interpret the PHRA consistently with Title VII. Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001) (The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably).

Dist. of Philadelphia, 198 F.3d 403, 409 (3d Cir. 1999).  A plaintiff bears the initial

burden of establishing a *prima facie* case of retaliation by a preponderance of the

evidence.  Storey v. Burns Int'l Sec. Servs., 390 F.3d 760 (3d Cir. 2004) (citing Tex.

Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).  To establish a *prima*

*facie* case of retaliation, a plaintiff must show that: (1) she engaged in protected activity;[10]

(2) the defendant took a materially adverse action against her; and (3) there was a causal

connection between the protected activity and the employer's adverse action.  Weiler v.

R&T Mech., Inc., 255 Fed. Appx. 665, 667-668 (3d Cir. 2007) (citing Moore v. City of

Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006)).  If Mrs. Wilson establishes this *prima*

*facie* case of retaliation, the burden of production shifts to Young Windows to articulate a

legitimate, nondiscriminatory reason for Mrs. Wilson's termination.  See McDonnell-

Douglas Corp. v. Green, 411 U.S. at 802.  Once the defendant meets this relatively light

burden, the burden of production returns to Mrs. Wilson, who must show by a

preponderance of the evidence that Young Windows' proffered reason is pretextual.  Id.

at 804-805.

     Mrs. Wilson argues that she has satisfied the first element of the *prima facie* case

through her repeated complaints to her supervisors and management about unfair

---

[10] Protected activity includes filing Charges of Discrimination or making complaints about discriminatory employment practices.  Abraham v. William Paterson College, 260 F.3d 265, 287-288 (3d Cir. 2001).  Informal charges or complaints of discrimination are sufficient to constitute protected activities for establishing a *prima facie* case of retaliation.  See Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).

treatment and harassment by Mr. Jeffers.  Specifically, Mrs. Wilson cites the testimony of Mr. Scanlon and Rudolph Pauline, another supervisor at Young Windows.  This evidence, however, can hardly be considered involving protected activity.  For example, Mr. Scanlon testified that on a couple of occasions, Mrs. Wilson told him about her fear of Mr. Jeffers.  See Scanlon Dep. at 17.  He later testified that Mrs. Wilson told him that she was intimidated by Mr. Jeffers and again that she was afraid of him.  Id. at 28-29. Though complaints, these exchanges between Mrs. Wilson and Mr. Scanlon are not complaints about discriminatory employment practices.  Further, Mr. Pauline testified that Mrs. Wilson had complained to him that she received an attendance point because her husband was taken to the hospital.  See Pauline Dep. at 27.  As described by Mr. Pauline, these complaints were about Mrs. Wilson's dissatisfaction with the company's no-fault attendance policy rather than about discriminatory employment practices.

To support further her contention that she satisfies the first prong, Mrs. Wilson also cites her own deposition where she testified that she had complained to Mr. Lepo about Mr. Jeffers' conduct, especially "how he doesn't hire women;" that "he doesn't want women to become 'A' rates;" and that after she became an "A" rate, Mr. Jeffers said to her "should there be a layoff, they would have to keep the 'A' rate men even though [she] had seniority."  See Wilson April 27, 2007 Dep. at 156.  She further testified that Mr. Lepo responded, "Well, you better get used to it, because he's not going anywhere." See Wilson July 24, 2007 Dep. at 11.  Certainly, this alleged exchange between Mrs.

Wilson and Mr. Lepo involved complaints about discriminatory practices at the company, and if credited, would constitute protected activity.

In a sworn affidavit, however, Mr. Lepo describes a different conversation. Mr. Lepo testified that at no time during his many conversations with Mrs. Wilson did she complain about any sexual harassment. See Def. Ex. 37. Once she had complained to him that Mr. Jeffers was "picking on her" by counting her windows. Mr. Lepo replied that Mr. Jeffers was not treating her any differently than he was treating everyone else; that Mr. Jeffers was hired to help implement change within the company; and that she would need to get used to these changes because that was the way things were and Mr. Jeffers was not going anywhere. Id. Mr. Lepo's version of the conversation does not include complaints about discriminatory practices, and thus does not involve protected activity.

Finally, Mrs. Wilson cites her sworn affidavit in which she recounts a conversation with Miss Cook, allegedly taking place in July 2005. Mrs. Wilson told Miss Cook that she was no longer able to endure the abusive environment with Mr. Jeffers. Mrs. Wilson testified that Miss Cook completely disregarded what Mrs. Wilson said about Mr. Jeffers. See Pl. Ex. 15 ¶ 62. Miss Cook testified that during her many conversations with Mrs. Wilson over the years, Mrs. Wilson only complained directly to her about the no-fault attendance policy. See Cook Dep. at 55-56. Miss Cook also testified that during a telephone conversation after Mrs. Wilson was terminated in October 2005, Mrs. Wilson

told her that she had become aware through psychotherapy that Mr. Jeffers was part of her problem. Id. at 148. Miss Cook found this curious because Mrs. Wilson had told her in July that she was requesting the leave of absence because of things going on in her personal life, i.e., "her father, her sister, the house, all those things." Id. Only Mrs. Wilson's versions of the conversations she had with Mr. Lepo and Miss Cook could be construed as involving protected activity. The defendant's managers' versions cannot. Because making the determination of whether Mrs. Wilson satisfies the first prong of the *prima facie* case of retaliation involves a credibility issue, it would be best left to the jury to decide. Accordingly, I will deny the defendant's motion for summary judgment as to Counts I and III.

### 2. Discriminatory Termination Based on the ADA

In Count II, Mrs. Wilson alleges that she is a member of a protected class as a person with a disability, i.e., depression and severe anxiety, who was able to perform her job at Young Windows with reasonable accommodations. Compl. ¶¶ 77-80. She further contends that Young Windows' alleged inaction concerning her complaints about Mr. Jeffers adversely affected Mrs. Wilson's ability to perform her job. Id. ¶ 81. The defendant argues that this count must be dismissed.

The Third Circuit Court of Appeals has indicated that the McDonnell Douglas burden-shifting framework applies to ADA claims. See Shaner v. Synthes (USA), 204 F.3d 494, 500-501 (3d Cir. 2000); see also Walton v. Mental Health Ass'n of

Southeastern Pa., 168 F.3d 661, 667-668 (3d Cir. 1999).  In order to establish a *prima facie* case of disability employment discrimination, Mrs. Wilson must demonstrate the existence of the following elements: (a) she is a disabled[11] person within the meaning of the ADA; (b) she is otherwise qualified[12] to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (c) she has suffered an otherwise adverse employment decision as a result of discrimination.  See Shaner, 204 F.3d at 500; see also Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998); Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998).  It is undisputed that Mrs. Wilson satisfies the first and third elements.  The defendant, however, challenges Mrs. Wilson's satisfaction of the second element, and claims that Mrs. Wilson cannot establish that she was qualified to perform her job on the date she was terminated.  A two-part test is used to determine whether someone is "a qualified individual with a disability."  29 C.F.R. pt. 1630.1, App. at 353-54.  First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."  Id. at 353.  Second, the court must consider "whether or not the individual can perform the essential functions of the

---

[11]  The ADA defines a disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2).

[12]  Under the ADA, a qualified individual with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ."  42 U.S.C. § 12111(8).

26

position held or desired, with or without reasonable accommodation." Id. After successfully performing the job for years and excelling to the point of being awarded the "A" rate, it is clear that Mrs. Wilson satisfied the prerequisites for the job.  It is the second step, however, which requires more thorough consideration.

As discussed above, Mrs. Wilson signed the FMLA papers on July 5, 2005, and they were approved by the defendant conditioned on receipt of appropriate health care provider certification.  The certification was submitted and it was anticipated that Mrs. Wilson would return to work by August 1, 2005.  Mrs. Wilson's short-term disability benefits application estimated that she would return to work on July 25, 2005.[13]  Mrs. Wilson explained the difference in these dates as the former taking into consideration that the entire plant takes an annual "vacation shutdown" for the week prior to August 1st. Nevertheless, because she was not, in fact, able to return by either of those dates, Mrs. Wilson supplied additional materials to extend the time away from work.  Muhammad Shamsi, M.D., a psychiatrist, submitted a physician's statement dated August 5, 2005. See Def. Ex. 56.  Dr. Shamsi indicated that Mrs. Wilson was continuously unable to work from July 6, 2005 until "the present," and that the date she should be able to return to work is "undetermined at present."  Id.  Dr. Shamsi also submitted an additional

---

[13]  At the time of her termination, Mrs. Wilson was receiving short-term disability benefits which began on July 13, 2005, and continued until January 11, 2006. Mrs. Wilson then filed a request for unemployment compensation, indicating that she was able and available to work as of January 29, 2006.  See Def. Ex. 65.  The record also suggests that she has applied for Disability Insurance Benefits.  See Def. Ex. 69.  The application for DIB is not part of this record.

Certification of Health Care Provider on which he estimated that the probable duration of Mrs. Wilson's condition would be two (2) months, and of her present incapacity would be one (1) month.  See Pl. Ex. 24.  The certification also anticipated that Mrs. Wilson may require an intermittent work schedule as a result of her condition for a probable duration of six (6) months.  Id.

On September 26, 2005, Miss Cook sent a letter to Mrs. Wilson notifying her that her FMLA leave would expire on October 4, 2005.  The letter advised that if Mrs. Wilson had a "disability" and needed a reasonable accommodation in order to perform the job, she should inform Miss Cook who would evaluate the situation.  It further stated that if Mrs. Wilson were not able to return to work by October 5, 2005, that the company "will need to fill [her] position."  See Def. Ex. 59.  Mrs. Wilson received this letter on September 28, 2005, and made repeated efforts to contact Miss Cook and/or Mr. Lepo.  Mrs. Wilson was told by the company receptionist that they were involved in union negotiations that week and could not be disturbed.  See Pl. Ex. 29.  Miss Cook did not return the telephone call until October 3, 2005 and left a message for Mrs. Wilson.  Id.  Miss Cook again left a message for her on October 4, 2005.  Later that day, Mrs. Wilson returned the call and left Miss Cook a message indicating that her therapists and psychiatrist felt that Mrs. Wilson was not yet ready to return to work.  Id.  Mrs. Wilson was terminated on the following day when she did not return to work.

The defendant challenges the second element of Mrs. Wilson's *prima facie* case.

28

It cites evidence submitted by Mrs. Wilson which claims that Mrs. Wilson was disabled and unable to work as of her date of termination. This evidence, the defendant insists, negates any contention that Mrs. Wilson was a qualified individual with a disability on the date she was terminated. I am not convinced.

The defendant cites a report dated August 1, 2007 from Mrs. Wilson's psychologist. See Def. Ex. 70; see also Def.'s Statement of Facts #97. A careful review of this report demonstrates that it is solely an attempt to explain what may have triggered Mrs. Wilson's anxiety attacks. The report does not provide an opinion regarding Mrs. Wilson's ability to perform work on August 1, 2007, or on October 5, 2005. Another report the defendant cites was authored by Mrs. Wilson's treating psychiatrist and dated March 30, 2007. Id. The psychiatrist explains that Mrs. Wilson had been in treatment since July 27, 2005; that she continued to struggle with lethargy, depressive episodes, and debilitating anxiety; that her condition rendered her incapable of attending to her daily functions; and that she had experienced an increase in her depression. Id. The report does not attempt to evaluate Mrs. Wilson's capacity to perform substantial gainful activity on the date she was terminated. A reasonable jury could find that Mrs. Wilson was able to perform her duties with a reasonable accommodation on October 5, 2005, but that her condition progressed over the two years following her termination, and deteriorated to the point of being unable to work at all. Indeed, being abruptly terminated after several years of service to an employer might even cause such deterioration to an employee suffering

from panic and anxiety in the midst of attempting to gain control of her mental health.[14]

Furthermore, it is rather disingenuous for the defendant to argue that Mrs. Wilson failed to engage in a reasonable accommodation dialogue with the defendant when it notified her of the expiration of her leave and requested that she respond should she need a reasonable accommodation, and then did not return her calls until the day before that leave was to expire. Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities. Taylor v. Phoenixville School District, 184 F.3d 296, 306 (3d Cir. 1999). The ADA specifies that an employer discriminates against a qualified individual with a disability when the employer does "not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A). The ADA's regulations state that:

> To determine the appropriate reasonable accommodation it
> may be necessary for the employer to initiate an informal,
> interactive process with the employee in need of
> accommodation. This process should identify the precise
> limitations resulting from the disability and the potential
> reasonable accommodations that could overcome those
> limitations.

---

[14] Accordingly, I place little emphasis on the psychiatrist's note dated nine (9) days after Mrs. Wilson's termination indicating that Mrs. Wilson "is unable to function due to the severity of her symptoms and as a result, she is unable to work." See Def. Ex. 64. The note also indicates that Mrs. Wilson's "symptoms have been exacerbated" by the stress created at work. Id.

29 C.F.R. § 1630.2(o)(3).  Similarly, the EEOC's interpretive guidelines provide that:

> Once a qualified individual with a disability has requested
> provision of a reasonable accommodation, the employer must
> make a reasonable effort to determine the appropriate
> accommodation.  The appropriate reasonable accommodation
> is best determined through a flexible, interactive process that
> involves both the employer and the employee with a
> disability.

29 C.F.R. Pt. 1630, App. § 1630.9 at 359; see also Mengine v. Runyon, 114 F.3d 415,

419-420 (3d Cir. 1997) (both parties have a duty to assist in the search for appropriate

reasonable accommodation and to act in good faith).  The Third Circuit Court of Appeals

agreed with the approach taken by the Seventh Circuit Court of Appeals which held that:

> An employee's request for reasonable accommodation
> requires a great deal of communication between the employee
> and employer.  Both parties bear responsibility for
> determining what accommodation is necessary.  Neither party
> should be able to cause a breakdown in the process for the
> purpose of either avoiding or inflicting liability.  Rather,
> courts should look for signs of failure to participate in good
> faith or failure by one of the parties to help the other party
> determine what specific accommodations are necessary.  A
> party that obstructs or delays the interactive process is not
> acting in good faith.  A party that fails to communicate, by
> way of initiation or response, may also be acting in bad faith.
> In essence, courts should attempt to isolate the cause of the
> breakdown and then assign responsibility.

Taylor v. Phoenixville Sch. Dist., 184 F.3d at 312 (quoting Bultemeyer v. Fort Wayne

Community Schools, 100 F.3d 1281 (7th Cir. 1996)).  Participation in the interactive

process is the obligation of both parties, so an employer cannot be faulted if after

conferring with the employee to find possible accommodations, the employee then fails to

31

supply information that the employer needs or does not answer the employers request for more detailed proposals. Id. at 317. The EEOC compliance manual provides that "a family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability." 2 EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 20-21; see also Bultemeyer, 100 F.3d at 1286 (finding that an employee's psychiatrist could make a request for accommodations on behalf of an employee).

Here, the defendant knew that Mrs. Wilson was treating with a psychiatrist and a psychologist for severe anxiety and panic attacks. Based on this evidence, the defendant had more than enough information to put it on notice that Mrs. Wilson may have had a disability, and therefore, in order to trigger the defendant's obligation to participate in the interactive process, Mrs. Wilson or her representative only needed to request accommodation. In August 2005, Dr. Shamsi submitted a supplemental Certification of Health Care Provider on which he estimated that Mrs. Wilson would require an intermittent work schedule as a result of her condition for a probable duration of six (6) months. See Pl. Ex. 24. Mrs. Wilson also testified that she had spoken with Mr. Lepo concerning her need to be separated from Mr. Jeffers. It was not incumbent on Mrs. Wilson or her psychiatrist to have invoked the ADA or used the words "reasonable accommodation" when requesting accommodations. Under the circumstances, it hardly should have come as a surprise that Mrs. Wilson would want some accommodations,

32

particularly for an employee who had previously performed very well. Instead, Miss

Cook placed the burden on Mrs. Wilson in correspondence, and proceeded to refuse her

telephone calls, union negotiations notwithstanding, for several days. Once the employer

knows of the disability and the employee's desire for accommodations, it makes sense to

place the burden on the employer to request additional information that the employer

believes it needs. Taylor v. Phoenixville Sch. Dist., 184 F.3d at 315. Disabled

employees, especially those with psychiatric disabilities, may have good reasons for not

wanting to reveal unnecessarily every detail of their medical records because much of the

information may be irrelevant to identifying and justifying accommodations, could be

embarrassing, and might actually exacerbate workplace prejudice. Id. The interactive

process, as its name implies, requires the employer to take some initiative. Id. The

interactive process would have little meaning if it was interpreted to allow employers, in

the face of a request for accommodation, simply to sit back passively, offer nothing, and

then, in post-termination litigation, try to knock down every specific accommodation as

too burdensome. Id. The EEOC's interpretive guidelines squarely place some of the

burden on the employer by stating that "the employer must make a reasonable effort to

determine the appropriate accommodation." Id. at 316 (quoting 29 C.F.R. Pt. 1630, App.

§ 1630.9 at 359).

    Viewing the evidence in the light most favorable to Mrs. Wilson, as the non-

moving party, a reasonable jury may see the defendant's actions as failing to engage in

the required dialogue of exploring whether a reasonable accommodation would have allowed Mrs. Wilson to continue to work.  Accordingly, summary judgment in favor of the defendant is not appropriate on this count.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEAH A. WILSON, | : | CIVIL ACTION |
|     Plaintiff | : | |
| | : | |
|     v. | : | NO. 06-5344 |
| | : | |
| YOUNG WINDOWS INC., et al., | : | |
|     Defendants | : | |

## O R D E R

AND NOW, this 3ʳᵈ day of March, 2009, upon consideration of the

defendant's motion for summary judgment (Document #53)[1], the plaintiff's response

thereto (Document #56), and the defendant's reply (Document #60), it is hereby

ORDERED that the motion is GRANTED in part and DENIED in part.


BY THE COURT:

_____
LAWRENCE F. STENGEL, J.

---

[1] The defendant's original motion for summary judgment (Document #50) which was
supplemented by the instant motion is hereby DENIED as moot.